Matthew R. Howell (6571)
FILLMORE SPENCER, LLC
3301 North University Avenue
Provo, Utah 84604
Telephone No. (801) 426-8200

*Attorneys for Aaron Jason Woolley*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AARON JASON WOOLLEY, | |
| Plaintiff, | **COMPLAINT** |
| v. | **(JURY DEMANDED)** |
| ANESTA LLC, and TEVA PHARMACEUTICALS USA INC., | Civil No. _____ |
| Defendants. | Judge _____ |

Aaron Jason Woolley, by and through his undersigned counsel of record, hereby complains and alleges against Anesta LLC ("Anesta") and Teva Pharmaceuticals USA, Inc. ("Teva"), as follows.

### PARTIES, JURISDICTION, AND VENUE

1.      Aaron Jason Woolley ("Woolley") is an individual that at all relevant times resided in the State of Utah but has since changed to residing part-time in the State of Utah and part-time in the State of Maryland.  Woolley is a citizen of the United States.  Woolley was an employee of one or both of the defendants.  Woolley worked in Utah and was fully qualified for the job position he held.

1

2.      Anesta is a Delaware limited liability company duly registered to do business in the State of Utah.

3.      Teva is a Delaware corporation that is duly registered to do business in the State of Utah.

4.      The jurisdiction of the court is invoked to secure protection and redress deprivation of rights secured by federal laws which prohibit discrimination against employees because of their race, religion, national origin, and age, under Title VII and which prohibit retaliation for the exercise of or actions taken to protect rights secured thereby.

5.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because claims brought herein arise under the Constitution and laws of the United States.  The Court further has jurisdiction pursuant to the provisions of Title VII, 42 U.S.C. §§ 2000e-5 and 2000e-16(c), and the general civil rights jurisdictional provisions of 28 U.S.C. § 1343(a)(4)

6.      Additionally, subject matter jurisdiction over claims based upon state law is proper pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Woolley was employed by Anesta and Teva within the District of Utah and his claims arise out of that employment.

8.      At all relevant times, Anesta was subject to the jurisdiction of the Court and subject to the applicable federal statutes and state law claims asserted herein.

9.      At all relevant times, Teva was subject to the jurisdiction of the Court and subject to the applicable federal statutes and state law claims asserted herein.

10.     Woolley filed a timely charge of discrimination with the Utah Anti-Discrimination Labor Commission (UALD) charging discrimination based on, *inter alia* race, religion, national origin, age, and retaliation.

11.     Woolley received a Right to Sue Notice from the EEOC on or about March 8, 2017 (a true and correct copy thereof is attached hereto as Exhibit 1) and filed the action within 90 days of his receipt of said Notice.

12.     Woolley has satisfied all administrative prerequisites associated with his claim of discrimination based on race, religion, and national origin and has exhausted his administrative remedies.

13.     Woolley was an employee working for Anesta and Teva from the March 2014 to until December 2015.

## FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

14.     Woolley is a citizen of the United States.

15.     Woolley is of Hispanic heritage.

16.     Woolley is a practicing member of the Church of Jesus Christ of Latter-Day Saints ("LDS Church").

17.     At all times relevant to this Complaint, Woolley was over the age of forty.

18.     Anesta and Teva operate a pharmaceuticals company in Salt Lake County, State of Utah.

3

19.     Woolley began working for Anesta and Teva in March 2014 at their Salt Lake City location.

20.     Woolley was hired and worked for Anesta and Teva as Director of Production. At all times during his employment with Anesta and Teva, Woolley had the necessary education, experience, training, and abilities to perform the responsibilities associated with this position.

21.     Woolley's performance reviews up to that time had all been at least "meets expectation" and often were "exceeds expectation."  He never had a review that indicated that he was failing to meet expectations.

22.     Additionally, during approximately spring and summer of 2014, Teva and Anesta made several organizational changes at Utah facilities.  During this process, one other manager, who was at the same managerial level as Woolley but who was in charge of Operational Excellence at the companies' Salt Lake site, decided to leave his employment.

23.     Woolley was assigned to take over this manager's responsibilities.  Woolley accepted and, though very difficult, performed the assignment with significant favorable impact for the organization.

24.     As Director of Production, Woolley reported directly to the facility's general manager, who was Woolley's direct supervisor.  This supervisor's name was Habib Nasirullah ("Nasirullah").

25.     Nasirullah often made derogatory comments about the LDS Church and Woolley's participation therein.  Additionally, Nasirullah complained about the good relationship between Woolley and Mark Castillo and Nasirullah specifically cited their shared religion as a basis for that relationship.

4

26.     Early during his time of employment with Anesta and Teva, a product support specialist position opened up over which Woolley had supervisory authority but Nasirullah had ultimate hiring authority for the position.

27.     Multiple individuals were considered for the position.  One of them (the "Applicant") was already an employee of Anesta and/or Teva.  The Applicant had all of the education, experience, training, and abilities necessary to perform the responsibilities associated with this position.  The Applicant had an exceptional employment history with Anesta and/or Teva.  Indeed, the Applicant was the most qualified person of those considered for the position.

28.     During the selection process, Nasirullah came out against promoting the Applicant.  While working with Nasirullah in the process, Woolley heard Nasirullah make negative comments about the Applicant that were based solely on the fact that the Applicant was female.  These comments included specifically that the employee had "no mechanical ability because she [was] a female," "no experience operating the relevant equipment" and that he wanted "a supervisor who could operate the equipment and she could not because she [was] female."

29.     Eventually, Nasirullah rejected the Applicant's request for the position and chose another person to fill the position and orally offered the position to that other person in a public setting.

30.     Based on what he had seen and heard during the selection process, Woolley contacted Mark Castillo, who was the Associate Director of Human Resources, and with Alpa Parker, who was Manager of Human Resources and Woolley's Human Resources Business Partner for the employees in Woolley's Production division.   Woolley discussed with these two

the handling of the situation and how to best report it to the appropriate individuals.  Human Resources encouraged Woolley to report the situation to the Office of Business integrity ("OBI").   Additionally, Woolley reported to Human Resources that the Applicant had approached him with concerns that she felt "discriminated" against and that she wanted to talk with Human Resources about the matter.  Woolley responded to the Applicant's comments by referring her to Human Resources, specifically to Alpa Parker for guidance on how to handle the situation.

31.   Based on what he had seen and heard during the selection process, Woolley referred the Applicant to OBI, the office within Teva that is responsible for handling issues relating to integrity, ethical behavior and compliance with applicable laws for Teva and its affiliates, including Anesta.

32.   After the Applicant made a complaint to OBI, Woolley supported her in that process and provided information important to the resolution of the issue.  This included Woolley submitting a formal complaint to OBI about Nasirullah's gender stereotyping and discrimination.

33.   Based on these complaints, OBI began an investigation into Nasirullah's conduct. As a result of learning about the investigation, Nasirullah quickly decided to have the Applicant fill the position so as to avoid any further negative follow up.  The OBI investigation substantiated the many of the complaints about Nasirullah, including his erroneous conclusion that the Applicant did not have the necessary mechanical aptitude for the position.  Despite this substantiation, the OBI investigative report tended to minimize the role that the Applicant's gender actually played in Nasirullah's decision not to grant her the position.

34.     As a result of this investigation and substantiation, on information and belief, beginning in May or June 2015, Nasirullah was counselled by Teva's and Anesta's upper management and/or Human Resources Department concerning conforming his conduct to the requirements of the law and the of the company.  Teva and Anesta required Nasirullah to correct several aspects of his behavior, including both those aspects that were unethical and/or illegal (such as discriminating against women) and those aspects that, though not necessarily illegal or unethical, were counterproductive to Teva's and Anesta's goals.

35.     During and immediately after this counselling period, Nasirullah's behavior improved dramatically, both toward Woolley and toward other employees as well.

36.     Soon after the counselling period ended, however, Nasirullah's negative behavior quickly returned.   Indeed, as related to Woolley, it escalated.   For instance, Nasirullah reprimanded Woolley for violating rules that were either not actually rules or that were not ever enforced and that Nasirullah himself violated.

37.     In approximately August 2015, Nasirullah began to demand that Woolley take on the job duties of a number of Woolley's peers, such as Validation and Technical Services, and Engineering/Maintenance.  Although Woolley had concerns with the wisdom and feasibility of these requirements, he absorbed these assignments because he feared continued retaliation from Nasirullah.  Additionally, Nasirullah began to remove and reassign several of Woolley's direct staff to other departments, thereby making Woolley's job more difficult and continued to levy more requirements on Woolley, which led to more time and work demands that were inconsistent with the requirements imposed on other employees at Woolley's management level.

38.     Shortly thereafter, on or about October 22 or 23, 2015, Nasirullah called Woolley in for a meeting.  During that meeting, Nasirullah demanded that Woolley absorb even more duties regarding Operational Excellence.  This demand was improper because the further increasing of Woolley's duties Woolley undermined his (as it would or anyone's) ability to meet the assigned responsibilities.  Woolley believed that Nasirullah was setting Woolley up for failure as a pretext for negative job action against him, in retaliation for Woolley's involvement in the OBI investigation.  Accordingly, Woolley resisted the new assignments.  The discussion between Woolley and Nasirullah intensified.  At that point, Woolley asked to leave the meeting so that things between them would not escalate to an unprofessional situation.

39.     Immediately following the meeting Woolley engaged the site Human Resources Leader to report the content of the meeting and to seek intervention.  During this meeting with Human Resources, Nasirullah barged in, presenting a veiled threat and demanding that Woolley immediately leave the premises "if you know what is good for you."

40.     At that time, Nasirullah placed Woolley on administrative leave with pay without any explanation for why and for what time period.

41.     As a result of this "suspension" Woolley contacted the OBI on October 26, 2015 to report the situation and to seek corporate intervention.  Woolley reported that he had been suspended without reason and no specific time period was given for return to work.  Woolley was told by the OBI liaison that a reason needed to be given and that an immediate internal investigation would take place to resolve the matter.

42.     Between Monday October 26 and 27, 2015, Isabel Carmona, the Vice President of Human Resources, contacted Woolley to discuss the situation and stated that there were several

concerns with how Nasirullah handled this situation as well as his past behaviors from Nasirullah. For instance, Carmona stated that she and Nasirullah's executive leadership were fully aware of the challenges that Nasirullah had created and that they had significant concerns with his behavior.

43. On Tuesday evening October 27, 2015, Woolley was contacted by Mark Castillo, the Site Human Resources leader, with the information that he was to return to work the following morning. Woolley was also told that "it will be good to have you back as you were greatly missed."

44. Shortly after this contact, on or about October 30, 2015, Woolley met with Alpa Parker of the Human Resources department and informed her that he wanted to file a claim of retaliation against Nasirullah and requested instructions on how to do that.

45. On or about November 6, 2015, Woolley's son had appendicitis and required emergency hospitalization. Accordingly, Woolley took approximately two days off of work.

46. Upon his return, Nasirullah presented Woolley with a performance improvement plan ("PIP"). This was despite the lack of Woolley having any history of poor job performance, indicating to Woolley that if certain improvements were not made, Woolley's employment would be negatively affected.

47. Woolley, although confused at this development, fully complied with all requirements imposed as part of the PIP. Indeed, in a one-on-one PIP meeting with Nasirullah on December 2, 2015, Woolley was told that his performance was acceptable and that Nasirullah had no concerns with Woolley's progress in meeting the conditions of the PIP.

48.    Despite Woolley's full compliance with the terms of the PIP, on December 4, 2015, Nasirullah, acting on behalf of Anesta and Teva, terminated Woolley's employment.

49.    The explanation for the termination given by Anesta and Teva was due to "racial targeting and stereotyping." Specifically, Anesta and Teva alleged that Woolley had made derogatory and insensitive comments to a fellow employee who was of Hispanic origin and background.

50.    This allegation was entirely false, particularly since Woolley himself is of Hispanic origin and background.

51.    Anesta and Teva failed to comply with company policy and contractual obligation to allow Woolley to present a defense to the allegations made against him.

52.    As a result of the loss of that employment, Woolley has suffered severe financial and personal losses.

**FIRST CLAIM FOR RELIEF**
**(Retaliation Relative to Applicant)**

53.    Woolley realleges and incorporates herein all other allegations of this Complaint, as if set forth expressly herein.

54.    Anesta and Teva intentionally, willfully, and wantonly retaliated against Woolley in response to his complaints of sexual harassment against the Applicant and his support of her through the investigation into her complaints against Nasirullah.

55.    As a direct and proximate result of the Anesta and Teva's conduct described herein, Woolley has suffered from a loss of income and benefits, severe emotional distress and mental anxiety, for all of which he should be compensated.

56.     The conduct alleged herein against Anesta and Teva constitutes violations of Title VII of the Civil Rights Act of 1964, as amended.

57.     Such conduct was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of punitive/exemplary damages which will serve as an example and deterrent to Defendant and others who would commit similar illegal acts.

WHEREFORE, Woolley prays for judgment as described below.

## SECOND CLAIM FOR RELIEF
### (Retaliation Relative to Woolley)

58.     Woolley realleges and incorporates herein all other allegations of this Complaint, as if set forth expressly herein.

59.     Anesta and Teva intentionally, willfully, and wantonly retaliated against Woolley in response to his complaints of retaliation against Woolley for his support of the Applicant and his support of her through the investigation into her complaints against Nasirullah.

60.     As a direct and proximate result of the Anesta and Teva's conduct described herein, Woolley has suffered from a loss of income and benefits, severe emotional distress and mental anxiety, for all of which he should be compensated.

61.     The conduct alleged herein against Anesta and Teva constitutes violations of Title VII of the Civil Rights Act of 1964, as amended.

62.     Such conduct was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of punitive/exemplary damages which will serve as an example and deterrent to Defendant and others who would commit similar illegal acts.

WHEREFORE, Woolley prays for judgment as described below.

### THIRD CLAIM FOR RELIEF
### (Religious Discrimination)

63.     Woolley realleges and incorporates herein all other allegations of this Complaint, as if set forth expressly herein.

64.     Anesta and Teva, by and through its Nasirullah, subjected Woolley to unwelcome, offensive and harassing religiously discriminatory conduct during his employment with Anesta and Teva.

65.     The unwelcome, offensive, and harassing discriminatory conduct included, among other things, making denigrating and offensive comments about Woolley's religious beliefs and practices.

66.     Anesta and Teva also terminated Woolley, in part, based on Woolley's religious beliefs and practices, that were different from those of his supervisor Nasirullah.

67.     The unwelcome, offensive and harassing discriminatory conduct was sufficiently severe and pervasive as to unreasonably interfere with the Woolley's mental health and emotional well-being as it created an intimidating, hostile and offensive working environment.

68.     The unwelcome, offensive and harassing behavior continued even after Plaintiff requested that it stop.  Indeed, Woolley discussed this issue directly with Nasirullah and with Mark Castillo of the Human Resources department.

69.     The conduct alleged herein against Anesta and Teva constitutes violations of Title VII of the Civil Rights Act of 1964, as amended.

70.     Such conduct was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of punitive/exemplary damages which will serve as an example and deterrent to Defendant and others who would commit similar illegal acts.

WHEREFORE, Woolley prays for judgment as described below.

## FOURTH CLAIM FOR RELIEF
### (Racial Discrimination)

71.     Woolley realleges and incorporates herein all other allegations of this Complaint, as if set forth expressly herein.

72.     Anesta and Teva, by and through Nasirullah, terminated Woolley's employment with Anesta and Teva based on Woolley's Hispanic racial heritage.

73.     Nasirullah, acting on behalf of Anesta and Teva, tried to hide this discrimination by claiming that it was Woolley that had acted in a discriminatory manner based on race but then failed to allow Woolley to offer a defense to the allegations.

74.     The conduct alleged herein against Anesta and Teva constitutes violations of Title VII of the Civil Rights Act of 1964, as amended.

75.     Such conduct was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of punitive/exemplary damages which will serve as an example and deterrent to Defendant and others who would commit similar illegal acts.

WHEREFORE, Woolley prays for judgment as described below.

## FIFTH CLAIM FOR RELIEF
### (National Origin Discrimination)

76.     Woolley realleges and incorporates herein all other allegations of this Complaint, as if set forth expressly herein.

77.     Anesta and Teva, by and through its Nasirullah, terminated Woolley's employment with Anesta and Teva based on Woolley's Hispanic and Mexican national origin.

13

78.     Nasirullah, acting on behalf of Anesta and Teva, tried to hide this discrimination by claiming that it was Woolley that had acted in a discriminatory manner based on national origin and heritage but then failed to allow Woolley to offer a defense to the allegations.

79.     The conduct alleged herein against Anesta and Teva constitutes violations of Title VII of the Civil Rights Act of 1964, as amended.

80.     Such conduct was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of punitive/exemplary damages which will serve as an example and deterrent to Defendant and others who would commit similar illegal acts.

WHEREFORE, Woolley prays for judgment as described below.

### SIXTH CLAIM FOR RELIEF
### (Breach of Contract)

81.     Woolley realleges and incorporates herein all other allegations of this Complaint, as if set forth expressly herein.

82.     At all times during Woolley's employment with Anesta and Teva, these two companies had in place a document entitled "Office of Business Integrity Procedure for Managing Reports of Misconduct" ("Integrity Procedure").

83.     The terms of that document constituted part of Woolley's contractual relationship with Anesta and Teva.

84.     The Integrity Procedure requires that "retaliation is strictly prohibited against Personnel who report potential Noncompliance or assist in an investigation, even if the allegations of Noncompliance are ultimately proven unfounded."  Integrity Procedure ¶ 4.7.1.

85.     Additionally, the Integrity Procedure provides that "Personnel who raise a Report in good faith will be supported by management and will not be subject to retaliation. Any act or

14

threat of retaliation will, in itself, be considered a serious violation of Teva's Code of Conduct." Integrity Procedure ¶ 4.7.2.

86.     Despite this provisions of the Integrity Procedure and terms of Woolley's employment contract, Anesta and Teva allowed and supported Nasirullah in his acts of retaliation against Woolley.

87.     These acts included, but were not limited to, the placing of Woolley on administrative leave, imposing on him the PIP, and ultimately terminating Woolley's employment.

WHEREFORE, Woolley prays for judgment as follows.

1.  With respect to all contractual and statutory claims, for compensatory, general, and special damages, including lost wages, past and future, and/or impairment of power to earn money, emotional pain, emotional distress and humiliation, past and future, past and future medical, psychological and counseling expenses, in an amount to be determined at trial but in no event less than $400,000;

2.  With respect to all statutory claims, for punitive damages in an amount to be determined at trial but in no event less than $600,000;

3.  For an award of pre- and post-judgment interest;

4.  For an award of reasonable costs and attorney fees; and

5.  For any and all other relief to which the Court determines to be just and equitable in the circumstances.

**JURY DEMAND**

Woolley demands trial by jury on all issues in this case that are so triable.


DATED this 24th day of April, 2017.

FILLMORE SPENCER, LLC


s/ Matthew R. Howell_____
Matthew R. Howell
3301 North University Avenue
Provo, Utah 84604

*Attorneys for Aaron Jason Woolley*