**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **AARON JASON WOOLLEY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ANESTA LLC and TEVA PHARMACEUTICALS USA, INC.,**<br><br>**Defendants.** | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>**Case No. 2:17-cv-00318-PMW**<br><br><br>**Chief Magistrate Judge Paul M. Warner** |

All parties in this case have consented to Chief Magistrate Judge Paul M. Warner conducting all proceedings, including entry of final judgment, with appeal to the United States Court of Appeals for the Tenth Circuit.[1]  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  Before the court is Defendant Teva Pharmaceuticals USA, Inc.'s ("Teva") motion for summary judgment.[2]

## PROCEDURAL BACKGROUND

Plaintiff Aaron Jason Woolley ("Woolley") filed his complaint in this case on April 24, 2017, alleging violations of Title VII of the Civil Rights Act of 1964 for retaliation, religious discrimination, racial discrimination, national origin discrimination, and breach of contract.[3]  Teva and the other named Defendant in this case, Anesta, LLC, filed their answer to Woolley's

---

[1] *See* docket no. 18.

[2] *See* docket no. 36.

[3] *See* docket no. 2.

complaint on June 16, 2017.[4]  On November 14, 2017, in response to a stipulated motion for dismissal,[5] Defendant Anesta, LLC was dismissed from the case,[6] leaving Teva as the only remaining named Defendant.

On May 17, 2018, Teva filed the motion for summary judgment currently before the court.[7]  After briefing on that motion was complete, the court held oral argument.[8]  At the hearing, Woolley was represented by Matthew R. Howell.  Teva was represented by Larry J. Rappaport.  After hearing the arguments of counsel, the court took the motion under advisement.

In his response to Teva's motion for summary judgment, Woolley has indicated that he is not pursuing further his claims for religious, racial, or national origin discrimination. Accordingly, the only claims the court must address here are Woolley's remaining claims for retaliation and breach of contract.

## FACTUAL BACKGROUND

1.      In late-January or in early-February 2014, Woolley interviewed for a position at Teva's facility in Salt Lake City, Utah, with several individuals, including Habib Nasirullah ("Nasirullah"), to whom Woolley would eventually report.

2.      Teva offered Woolley the position on February 12, 2014, and his first day of work with Teva was March 3, 2014.

---

[4] *See* docket no. 19.

[5] *See* docket no. 27.

[6] *See* docket no. 29.

[7] *See* docket no. 36.

[8] *See* docket no. 45.

3.     In his position, Woolley had multiple responsibilities related to the manufacturing and packaging operations for the production of commercial products and clinical supplies produced by Teva's facility in Salt Lake City.

4.     In or around February 2015, Teva interviewed three employees for a vacant supervisor position.

5.     Woolley and three other Teva employees ("Hiring Panel") participated in the selection process for the open position.

6.     The Hiring Panel's preferred candidate for the position was Shauntel Harrison ("Harrison"), a female employee.

7.     After the Hiring Panel completed its interviews, Nasirullah became involved and interviewed the three candidates himself.  He then decided that another candidate, Steve Tanner ("Tanner"), a male employee, was a better fit for the position.

8.     Mark Castillo ("Castillo"), who was part of Teva's human resources department, testified that Tanner's strong technical skills were known at the facility and that Tanner was the go-to person with regard to equipment.

9.     Woolley shared with Nasirullah that the Hiring Panel preferred Harrison given her positive performance reviews and supervisory experience.

10.     Despite the Hiring Panel's preference, Nasirullah approached Tanner on the production floor and verbally offered him the vacant supervisor position.

11.     Nasirullah's verbal offer to Tanner was unexpected, and not the usual way in which Teva offers positions.  Alpa Parker ("Parker"), who was a member of Teva's human

resources department, testified that corporate sign-offs on offers of employment and/or

promotions are usually required and that corporate had not signed off on an offer to Tanner.

12.     On April 24, 2015, shortly after Nasirullah verbally offered Tanner the position of

Packaging Supervisor, Woolley filed a complaint with Teva's Office of Business Intergity

("OBI"), coded "Misconduct or Inappropriate Behavior" ("April 2015 Complaint").  The April

2015 Complaint alleged that Nasirullah disregarded Teva's policies and processes with respect to

filling the vacant supervisor position and that Nasirullah did not "care for feedback from

[Woolley]" with respect to restructuring the department.[9]

13.     The April 2015 Complaint specifically alleged:

> On April 17, [Nasirullah] informed . . . Harrison, packaging
> support specialist, that she wouldn't get the job as a supervisor.
> [Nasirullah] informed . . . Tanner, line leader, that he had gotten the
> job as a supervisor.  [Nasirullah] did not offer [Tanner] a formal
> job offer.  [Nasirullah] provided employment promises to [Tanner].
> [Nasirullah] was not following the company policies in regards to
> employment practices.
>
> [Nasirullah] informed [Woolley] that [Tanner] had the mechanical
> capability to fill the position of supervisor.  [Nasirullah] also told
> [Woolley] that [Harrison] was a nice woman, but she did not have
> the mechanical capability.  [Nasirullah] insinuated that [Harrison]
> did not have the mechanical aptitude to fill the role.[10]

14.     The April 2015 Complaint made additional allegations towards Nasirullah:

> On April 15, [Woolley] had a meeting with [Nasirullah].
> [Nasirullah] presented a restructuring of the department.
> [Nasirullah] was not interested in hearing [Woolley]'s feedback or
> contributions that [Woolley] could have potentially made to the

---

[9] Docket no. 36, Exhibit 2 to Exhibit N.

[10] *Id.*, Exhibit 2 to Exhibit N.

restructure.  [Nasirullah] made it clear that he wanted his plan followed, and that he did not care for feedback from [Woolley].

. . . .

This is only a recent example of a series of events that show [Nasirullah] does not respect the policies process.  [Woolley] states that [Nasirullah] is not following Teva's company values of collaboration, respect, and leadership.  The value of respect defines that verbal acts that create a hostile work environment are not to be tolerated.  [Woolley] believes that [Nasirullah] has created hostility and intimidation; therefore violating one of Teva's company values.  Again, this only of [sic] many examples of the company values that [Nasirullah] is violating.  [Woolley] states that [Nasirullah]'s actions are putting many employees into a position that compromises their personal values and Teva's values.  [Nasirullah] is mandating that employees not follow the company values.[11]

15.     The April 2015 Complaint does not state that he believed Nasirullah promoted Tanner over Harrison because of Harrison's gender.

16.     Woolley claims that the April 2015 Complaint was made by way of a phone call in which he indicated that Harrison was being denied a promotion because of her gender. Woolley also claims that he made later statements indicating that Nasirullah discriminated against Harrison because of her gender.

17.     Woolley claims that because the April 2015 Complaint was drafted by someone else, he is not responsible for the failure to include in the complaint his allegations about gender discrimination by Nasirullah.

18.     None of Woolley's complaints about gender-based discrimination are included the April 2015 Complaint.

---

[11] *Id*., Exhibit 2 to Exhibit N.

19.     On April 28, 2015, Harrison filed her own OBI complaint against Nasirullah alleging that Nasirullah had not "treated her fairly in the selection process" and that she felt his decision "was favoritism because he wanted . . .  Tanner – Packaging Line Lead in the role."[12]

20.     Harrison's OBI complaint likewise does not state that she felt discriminated against or harassed by Nasirullah, or anyone at Teva, based on her gender.

21.     Parker testified that she spoke with Harrison regarding Harrison's OBI complaint and that Harrison "said something about Tanner being more technical.  I remember her saying that she thought [Nasirullah] didn't know anything about her, what she does or anything like that."[13]

22.     OBI conducted formal investigations into both Woolley's and Harrison's complaints against Nasirullah.  Leander Jones ("Jones"), who was part of Teva's human resources department in Virginia, led those investigations and prepared two detailed reports that memorialized his findings.

23.     As part of the investigation into the April 2015 Complaint filed by Woolley, Jones interviewed several Teva employees, including Nasirullah, Woolley, Patricia Kitchen ("Kitchen"), and Joel Childs ("Childs").

24.     Jones' OBI report indicates that Nasirullah preferred Tanner over Harrison because Tanner provided better answers to Nasirullah's interview questions, and because Tanner had more experience.

---

[12] *Id*., Exhibit A to Exhibit J; *see id*. Exhibit 3 to Exhibit N.

[13] *Id*. Exhibit K.

25.     Nasirullah told Jones that "[Tanner] had the technical ability and knowledge to move the plant forward"; "[Harrison] on the other hand, did not have the technical ability for the role"; and Tanner had twelve years of experience.[14]

26.     Childs, who was on the Hiring Panel, reported to Jones that "at the end of the process [Childs] felt . . . Tanner had exhibited that he had the expertise and skill to fill the role"; that Harrison "did a good job in the interview, but [Childs] felt her strengths were more on the documentation side of the role"; and that Harrison "didn't appear to have the technical level of expertise that [Tanner] had."[15]

27.     Kitchen, who was hired by Nasirullah, likewise told Jones that, although she did not participate in the interview process, she

> conveyed to [Nasirullah] that when she has gone to the floor it's obvious to her that [Tanner] is well versed in the equipment and the processes associated with Packaging.  Says she has seen [Harrison] involved in more of the batch records and other data management side of the process.  Says [Harrison] does a very good job with this, but says [Harrison] does not seem to be involved that much in a lot of the technical troubleshooting and fixes in the area. Said [Tanner] is clearly more technically proficient on the equipment and process.  Said she told [Nasirullah] that [Tanner] would be the best fit for the position and not [Harrison].[16]

28.     Neither of Jones' two comprehensive reports makes any mention of gender discrimination, gender stereotyping, or sexual harassment.

---

[14] *Id*., Exhibit A to Exhibit J.

[15] *Id*., Exhibit A to Exhibit J.

[16] *Id*., Exhibit A to Exhibit J.

29.     Woolley claims that Jones' notes from his interview with Woolley show that Woolley's complaint included allegations of gender discrimination by Nasirullah.

30.     Jones did, however, partially substantiate some of the claims Woolley made against Nasirullah, including that Nasirullah did not follow the Hiring Panel's recommendation for the vacant supervisor position; that Nasirullah did not take Woolley's opinion into account when deciding whether and how to restructure the department; that Nasirullah did not follow proper procedures when he verbally offered the position to Tanner; and that Nasirullah did not follow company values of collaboration, respect, and leadership with respect to Nasirullah's issue of micro-managing his department.

31.     Jones' report noted that Woolley and Nasirullah's "relationship is not working well and has deteriorated to the extent that neither party seems willing to work through their difference[s]," but that there "was no evidence to support that [Nasirullah] deliberately worked against the company values."[17]

32.     Jones also investigated Harrison's complaint that "Nasirullah had not treated her fairly in the selection process" and that Nasirullah "did not listen to what she was sharing with him and did not take her background and experience into consideration when making a hiring decision."[18]

33.     As part of his investigation into Harrison's complaint, Jones interviewed Nasirullah, Woolley, Castillo, and Parker.  None of the individuals interviewed, including

_____

[17] *Id*., Exhibit A to Exhibit J.

[18] *Id*., Exhibit A to Exhibit J.

Harrison, told Jones that they felt as though Nasirullah's decision to promote Tanner over Harrison was because of Harrison's gender.

34. Woolley claims that is contradicted by Jones' own notes.

35. Tanner ultimately declined the position sometime after Woolley told Tanner that Woolley had rated other candidates higher than him and had a "very candid conversation about what [Tanner] needed to focus on so that he could be successful."[19]

36. In or around June 2015, Harrison was promoted to the vacant supervisor position.

37. Nasirullah held a meeting on October 23, 2015, with Woolley and another Teva employee to discuss the certain issues involving Woolley's department.

38. Nasirullah testified that Woolley became very aggressive during the meeting and that Woolley raised his voice to Nasirullah.

39. Woolley contends that he was merely firm and did not raise his voice unreasonably or inappropriately.

40. Nevertheless, this was not Woolley's first conflict with Teva personnel. For example, in early-September 2015, there were reported rumors that Woolley had told several Teva employees that he was going to take certain action against another Teva employee. Castillo investigated the rumors, and while he was unable to corroborate such, he did note: "Based on feedback from others who have experienced negative discussions in how [Woolley] addresses them, I would say most of the fault lies with [Woolley]. Multiple individuals have shared

---

[19] *Id.*, Exhibit A.

feedback that when [Woolley] talks to them, he can be inpatient [sic] and discourteous when addressing them."[20]

41.    Following the October 23, 2015 meeting, Nasirullah met with Castillo to explain what had occurred and told Castillo that he was uncomfortable with Woolley reporting to work the following Monday (October 23, 2015, was a Friday).

42.    Castillo called Woolley on October 24, 2015, to advise Woolley that he was being placed on a paid suspension.

43.    Nasirullah testified that his decision to suspend Woolley was made out of concern for both operations and company security.

44.    On October 26, 2015, Woolley, while still on paid suspension, called OBI to complain that Nasirullah was retaliating against him ("October 2015 Complaint"). The October 2015 Complaint states:

> [Woolley] had made a former hotline complaint against [Nasirullah] when [Nasirullah] did not follow the proper hiring processes when filling an open position. [Woolley] states that [Nasirullah] is intentionally gathering feedback from [Woolley]'s team in an effort to make [Woolley] look bad . . . . [Nasirullah] also gives [Woolley] a hard time about the times that [Woolley] chooses to use the company fitness center. [Woolley] states that [Nasirullah] questions him on things that he never previously used to. [Woolley] states that all of this behavior is indicative of retaliation.[21]

45.    On November 11, 2015, following his return to work, Woolley was placed on a Performance Improvement Plan ("PIP").

---

[20] *Id.*, Exhibit 5 to Exhibit N.

[21] *Id.*, Exhibit 4 to Exhibit N.

46. In a November 10, 2015 e-mail, Castillo explained that the PIP needed to be presented to Woolley with caution because Castillo

> could see [Woolley] reacting emotionally to the PIP, as he has done with other discussions you have had with him. I think it needs to be made clear to him that the idea behind the PIP is to help him, and in turn, the Production Department, become successful. I can also help reinforce this message with you. Continued outbursts are unacceptable.[22]

47. Isabel Carmona ("Carmona"), who was part of Teva's human resources department, testified that given the "combination of challenges regarding [Woolley's] performance and also his behavior," and given the "number of complaints and a number of issues that were happening at the site level involving him[,] . . . we approved the [PIP]."[23]

48. Other employees had also filed internal complaints against Woolley during his employment. Castillo specifically testified:

> Q:  Did it ever occur to you during 2015 that, boy, there were a lot of complaints about . . . Woolley?
>
> A.:  Yes.[24]

49. The internal complaints against Woolley included:

---

[22] *Id.*, Exhibit 3 to Exhibit C.

[23] *Id.*, Exhibit F.

[24] *Id.*, Exhibit C.

a. In May 11, 2015, George Oteng-Attakora, a Teva employee, filed an OBI complaint against Woolley alleging that he was "working under a lot of stress," he felt "targeted" by Woolley, and Woolley had "crafted" unfounded allegations against him.[25]

b. On June 17, 2015, another Teva employee, Mark Hansen, filed an OBI complaint against Woolley alleging that he "felt segregated from his department" and that management "has been making and enforcing excessive changes to my personal and professional life with no concern to my personal wellbeing and safety with no inclusion or discussion with me of any kind beforehand."[26]

c. On October 11, 2015, Justyna Butler ("Butler"), another Teva employee, filed a complaint against Woolley alleging that he had acted "unprofessional" and that she did "not feel comfortable around him."  Specifically, Butler alleged that she put a chart meant for production in the production file, instead of in the planning file, and that Woolley confronted her about it in a public workspace.  According to Butler, she tried to explain the mix-up, but "[Woolley] repeatedly cut me off and would not let me explain my side of the issue."[27]

50. Woolley contends that those complaints were not substantiated by Teva.

51. Carmona testified that Woolley's performance issues were that:

> He was a weak leader.  He was not providing strong direction to his team at the site.  He also had a very toxic relationship with other members of the leadership team that were causing, you know,

---

[25] *Id.*, Exhibit 7 to Exhibit G.

[26] *Id.*, Exhibit 8 to Exhibit A.

[27] *Id.*, Exhibit 9 to Exhibit A.

the team to underperform and also, of course, his own team in the production area.[28]

52.     Christopher Swartz ("Swartz"), a Teva employee, testified that the "intent of a [PIP] is to improve one's performance through a very regimented set of objectives and milestones where you then receive feedback against that and improve your performance."[29]

53.     Swartz testified that the feedback he received regarding Woolley was that Woolley's "performance was quite derailing and warranted a much more formal approach to improve his performance."[30]

54.     Swartz testified that while a PIP is not intended to be punitive, if an individual on a PIP does not in fact improve, the next step is usually termination from employment.

55.     On November 21, 2015, while Woolley was still on the PIP, Ignacio Lemus ("Lemus"), a Teva employee, filed a formal complaint with OBI, coded "Discrimination or Harassment," which alleged:

> I have cried myself to work all the time lately. And I don't think local HR taken [sic] these issues seriously. I feel racially stereotyped and targeted by . . . Woolley . . . . I have been with Teva for 11 years and have never experienced anything like this. I am an American born with Hispanic origin. Any time [Woolley] talks to me, he has made Latino gang gestures/comments and racial ridicule to put me down. Recently I made an error on the floor for the first time at Teva. I take fully responsibility for it but it happened because I was rushed trying to put the place in order for an audit. I received an unfair punishment by given a written warning. In addition, [Woolley] has made a point to make my work very stressful and difficult. He shows favoritism to my

---

[28] *Id.*, Exhibit F.

[29] *Id.*, Exhibit H.

[30] *Id.*, Exhibit H.

counterpart white female workers who got away with significant
compliance issues on the floor again and again. I love working for
Teva and proud of the quality of my work but this mistreatment has
stressed me and demoralized me greatly.[31]

56.     With respect to the October 2015 Complaint, Carmona interviewed Woolley, and

e-mailed her findings to Swartz and Kathleen Veit ("Veit"), the Director of OBI. In relevant part,

that e-mail states:

I have looked for clues and evidence of retaliatory behavior, but all
I got out of this conversation was the usual – I do not trust
[Nasirullah] – [Nasirullah] does not trust me and everything else
that comes with it. It is very interesting that he pointed out at the
fact that [Nasirullah] has been managing his performance more
closely than usual since the beginning of August; this timing
coincides with the feedback sessions that [another Teva employee]
and I had with [Nasirullah] regarding his responsibilities as the
leader of site which include holding his team accountable for their
performance and behavior.[32]

57.     On November 24, 2015, Swartz interviewed a number of employees, including

Kitchen, to investigate whether they had any knowledge of the claims made by Lemus against

Woolley, or Woolley's claim that Nasirullah was unfairly targeting and/or retaliating against

Woolley.

58.     Kitchen told Swartz that Nasirullah "seems to be 'easy' with [Woolley]. While he

doesn't seem to hold [Woolley] accountable, he holds [Kitchen] accountable instead. There is

---

[31] *Id*., Exhibit 2 to Exhibit I.

[32] *Id*., Exhibit 11 to Exhibit F.

tension between [Nasirullah] and [Woolley]. [Nasirullah] stated that if he 'goes after' [Woolley], then [Woolley] will file a complaint."[33]

59. None of the individuals that were interviewed reported that Nasirullah treated Woolley unfairly or targeted Woolley in any way.

60. Following Teva's investigation of Lemus' claims, a decision was made to terminate Woolley from his employment for "violating Teva's code of conduct by using racial stereotyping and making racially insensitive comments to employees in the facility while coupled with being on a [PIP]."[34]

61. Nasirullah was not directly involved with the investigation into Lemus' complaints against Woolley.

62. Swartz prepared the Corrective Action Notice, the operative document given to employees terminated from employment. It explained that "[d]ue to the seriousness of your actions, in addition to the fact that you are already on a [PIP], your employment with Teva will be terminated, effective immediately." It specifically stated that Woolley "violated [Teva's] Standards of Conduct by demonstrating racial targeting and stereotyping," "demonstrated incredibly poor judgment and leadership," and "created undue stress and embarrassment to employees."[35]

---

[33] *Id.*, Exhibit 12 to Exhibit H.

[34] *Id.*, Exhibit H.

[35] *Id.*, Exhibit 5 to Exhibit H.

63.     On December 4, 2015, Woolley was presented with the Corrective Action Notice and was terminated from his employment.

## SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court reviews the facts in a light most favorable to the nonmovant and draws all reasonable inferences in the nonmovant's favor. *See Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

## ANALYSIS

As noted previously, Woolley is pursuing only his claims for retaliation and breach of contract. The court will address those claims in turn.

## I.     Retaliation

The "anti-retaliation" provision of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

To succeed on a claim of retaliation under Title VII, a "plaintiff must establish that retaliation played a [motivating] part in the employment decision and may choose to satisfy this burden in two ways." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224-25 (10th Cir. 2008). Direct evidence of retaliation is evidence that is retaliatory on its face and requires no inferences

16

or presumptions. *See id.* at 1226-1227. As noted by Teva, there is no direct evidence either pleaded or discovered as it relates to Woolley's two retaliation claims. Accordingly, when the "plaintiff is unable to directly establish that retaliation played a motivating part in the employment decision at issue," he must instead, "rely on the now familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation." *Id.* at 1225.

Under that framework,

> the plaintiff must first make out a prima facie case of retaliation by showing (1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. If the plaintiff establishes a prima facie case, the employer must then offer a legitimate, nonretaliatory reason for its decision. Finally, once the employer has satisfied this burden of production, the plaintiff must show that the employer's reason is merely a pretext for retaliation.

*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (quotations and citations omitted).

In this case, the court will assume, without deciding the issue, that Woolley has made out a prima facie case of retaliation. Even if that were the case, the court concludes that Teva has proffered legitimate, nonretaliatory reasons for Woolley's discipline and termination and that Woolley has failed to demonstrate that those reasons are pretextual.

First, Woolley's behavior during the events of the October 23, 2015 meeting was a legitimate, nonretaliatory reason for Woolley being suspended and eventually placed on the PIP. Woolley's interpretation of his behavior as being calmer than described by Nasirullah does not make that reason pretextual. *See Lobato v. New Mex. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir.

2013) ("In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision[,] not the plaintiff's subjective evaluation of the situation." (quotations and citations omitted) (alteration in original)). When viewing the facts from Nasirullah's perspective, the logical conclusion is that Woolley's suspension and PIP, which were put in place immediately after the meeting, were the result of his behavior during the meeting, not the result of the April 2015 Complaint, which was lodged months earlier.

Second, Lemus' OBI complaint and the subsequent investigation were legitimate, nonretaliatory reasons for Woolley's termination. While Woolley disputes the veracity of the allegations made by Lemus in the OBI complaint, Teva does not need to demonstrate the truth of those allegations. Instead, Teva need only establish that it honestly believed its reason for terminating Woolley, namely Lemus' allegations, to survive a claim of pretext. *See Lual v. Los Alamos Nat'l Labs.*, 714 Fed. App'x 832, 840-41 (10th Cir. 2017) (holding that the honest belief of an employer is sufficient to show that the employer decision was not retaliatory). Indeed, it is not the court's role "to ask whether the employer's decision was wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs." *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (quotations and citations omitted) (alterations in original).

> That individuals and companies sometimes make employment decisions that prove to be bad ones in hindsight usually suggests no more than that—that they got it wrong. To support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong. He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda.

> This is because Title VII licenses [courts] not to act as a super
> personnel department to undo bad employment decisions; instead,
> it charges [courts] to serve as a vital means for redressing
> discriminatory ones.

*Id*. (quotations and citation omitted).

For those reasons, the court concludes that Woolley's retaliation claim cannot survive summary judgment. Therefore, that claim is dismissed with prejudice.

## II. Breach of Contract

In this claim, Woolley alleges that Teva breached a contract with him by allowing and supporting Nasirullah's acts of retaliation. Woolley specifically relies on Teva's Office of Business Integrity Procedure for Managing Reports of Misconduct ("OBI Procedure") and claims that this document created a contractual agreement between Woolley and Teva.

Employment relationships in Utah are "presumed to be at-will." *Payan v. United Parcel Serv.*, 2:14-CV-00400-JNP, 2016 WL 5724743, at *9 (D. Utah Sept. 30, 2016) (citing *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 976 (Utah 2009)). "'[W]hen an employee handbook contains a clear and conspicuous disclaimer of contractual liability, any other agreement terms must be construed in light of the disclaimer.'" *Id*. (quoting *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 334 (Utah 1992)). "The existence of a clear and conspicuous disclaimer, as a matter of law, prevents employee manuals or other like material from being considered as implied-in-fact contract terms." *Branham v. Delta Airlines*, 184 F. Supp. 3d 1299, 1315 (D. Utah 2016) (quotations and footnote omitted).

Teva argues that Woolley's employment status was always at-will, as best evidenced by his offer letter, which indicated that his employment was at-will. Teva contends that there is no

evidence to suggest that the OBI Procedure or anything else modified the at-will employment relationship. The court agrees.

Woolley's offer letter plainly states:

> The nature of your employment with us is and will be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason, without further obligation or liability.
>
> . . . .
>
> This offer letter sets forth the full and complete agreement between you and us regarding your employment, and supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter contained herein.[36]

The court concludes that, based on the language of his offer letter, Woolley is unable to overcome his at-will status. Furthermore, as argued by Teva, the applicable Teva policy, the Coaching, Counseling and Corrective Action Policy ("Policy"), makes it clear that the Policy and the subjects discussed within are not of a contractual nature. The Policy states that "[e]mployment remains at will, and this policy does not create a contractual right of any employee to be employed, to review the disciplinary or discharge policies applied in a particular case, or to be entitled to any particular level of discipline in a given circumstance."[37] Woolley's reliance upon the OBI Procedure does nothing to alter that conclusion. As noted above, when there is "'a clear and conspicuous disclaimer of contractual liability, *any other agreement terms*

---

[36] *Id.*, Exhibit 1 to Exhibit D.

[37] *Id.*, Exhibit 8 to Exhibit H.

*must be construed in light of the disclaimer.*'"  *Payan*, 2016 WL 5724743, at *9 (quoting

*Hodgson*, 844 P.2d at 334) (emphasis added).  Given the clear disclaimers in Woolley's offer

letter and the Policy, the OBI Procedure must be construed in light of those disclaimers.

For those reasons, the court grants Teva's motion for summary judgment on Woolley's

breach of contract claim.  Accordingly, that claim is dismissed with prejudice.

## III.    Other Claims

As previously noted, in his response to Teva's motion for summary judgment, Woolley

has indicated that he is not pursuing further his claims for religious, racial, or national origin

discrimination.  He further indicates that he does not oppose Teva's motion for summary

judgment as to those claims.  Accordingly, the court grants Teva's motion for summary judgment

on those claims and dismisses them with prejudice.

## <u>CONCLUSION AND ORDER</u>

Based upon the foregoing, IT IS HEREBY ORDERED that Teva's motion for summary

judgment[38] is GRANTED in its entirety and this action is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DATED this 29th day of March, 2019.

BY THE COURT:

PAUL M. WARNER
Chief United States Magistrate Judge

---

[38] *See id.*